Cyrus A. Morton (*pro hac vice* forthcoming)
Robins Kaplan LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
612-349-8500
CMorton@RobinsKaplan.com

Li Zhu (CA Bar No. 302210)
Robins Kaplan LLP
555 Twin Dolphin Drive, Suite 310
Redwood City, CA 94065
650-784-4040
LZhu@RobinsKaplan.com

Stephen R. Risley (*pro hac vice* forthcoming)
KENT & RISLEY LLC
5755 North Point Parkway, Suite 57
Alpharetta, Georgia 30022
404-855-2101
steverisley@kentrisley.com

Attorneys for Plaintiff,
IngenioShare, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INGENIOSHARE, LLC,<br>Plaintiff,<br>v.<br>RIOT GAMES, INC.,<br>Defendant. | Case No. 2:26-cv-12284<br>**COMPLAINT FOR PATENT INFRINGEMENT** |

IngenioShare, LLC states for its Complaint against Riot Games, Inc. as follows:

**INTRODUCTION**

1. This is an action for patent infringement arising under the patent laws of the United States, Title 35, United States Code.

2. As further detailed herein, IngenioShare files this action at this time to preserve its ability to seek recovery for Riot Games, Inc.'s ongoing infringement while the pending Federal Circuit appeal regarding certain claims in IngenioShare's U.S. Patent Nos. 10,142,810 and 10,708,727 remains pending. Accordingly, IngenioShare intends to seek a stay of this action pending resolution of that appeal.

**THE PARTIES**

3. IngenioShare, LLC ("IngenioShare") is a limited liability company organized and existing under the laws of the State of California.

4. Defendant Riot Games, Inc. ("Defendant" or "Riot") is a corporation duly organized and existing under the laws of the State of Delaware. Riot is registered to do business in the State of California with a principal address at 12333 W. Olympic Boulevard, Los Angeles, California 90064. Riot's registered agent in California is CT Corporation System.

**JURISDICTION AND VENUE**

5. This Court has subject matter jurisdiction over all causes of action set forth herein pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, including 35 U.S.C. § 271 *et seq*.

6. This Court has personal jurisdiction over Riot because Riot has a principal place of business in the State of California and in this Judicial District and Division. Riot therefore has minimum contacts with the State of California and has purposefully availed itself of the privileges of conducting business in the State of California. Additionally, this Court has general personal jurisdiction over Riot

because Riot maintains its headquarters and principal place of business in this District at 12333 W. Olympic Boulevard, Los Angeles, California 90064.

7. On information and belief, Riot has committed and continues to commit acts of infringement in the State of California and in this Judicial District and Division, and the claims addressed in this Complaint arise out of and relate to such acts, including at least by making, using, offering for sale, and selling the infringing technology, products, systems, methods, and/or computer software within this District and Division.

8. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1400(b) because Riot has committed acts of infringement in this District and maintains a regular and established place of business in this District, including its headquarters at 12333 W. Olympic Boulevard, Los Angeles, California 90064 and Riot is registered with, and authorized to transact business in, the State of California.

## INGENIOSHARE'S INVENTIVE AND PATENTED TECHNOLOGY

9. Generally speaking, IngenioShare's patented technology comprises different embodiments of a computer-implemented system and method to manage communications of a user. These embodiments include server-based communications systems, as claimed in the '407 patent, and network-based portals, as claimed in the '810, '727, and '901 patents. Although the asserted claims recite different limitations, the inventions generally concern management of electronic communications through network-connected computing systems, including the handling of messages and the protection of users' contact information. In one embodiment, an apparatus, using at least a network-based portal based on Internet protocol provides a number of communication options to a first user, with messages eligible to be received via an electronic device associated with a second user based on any of the options depending on an identifier associated with the second user, the options including text messaging and voice communication; could

receive an indication from the first user via an electronic device associated with the first user, indicating the selection of a communication option for a message for the second user; could permit the second user to block the first user from accessing the second user; and could determine availability of the second user to receive the message. The apparatus could require contact information associated with the second user to allow the second user to receive messages via the network-based portal, with the contact information associated with the second user not provided to the first user via the electronic device associated with the first user, even when the message is received by the second user via the electronic device associated with the second user, and with the contact information associated with the second user being distinct from the identifier associated with the second user.

**The Prior Art and Its Deficiencies**

10. As described in the specification(s) of the patents-in-suit, individual users often utilized multiple communication modes, including desk phones, fax machines, mobile phones, email, and instant messaging, and may possess several phone numbers and email addresses. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 1, lines 50–55. As discussed in the specification(s) of the patents-in-suit, a persistent need existed to effectively manage these numerous communication channels. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 1, lines 56–61.

11. The technical challenge of managing an individual's electronic communications arose in the 1990s, as advancements in Internet and cellular network technologies enabled users to access multiple new communication devices, such as computers and mobile phones, in addition to conventional landline phones and fax machines.

12. At that time, landline telephone networks, the Internet, and cellular networks operated as separate, non-integrated technologies. Traditional phone calls and fax transmissions were conducted over the landline network; mobile calls and SMS messages were transmitted via cellular networks; and email and other text-

based communications were sent over the Internet. Even within a single network technology, different modes of communication relied on distinct protocols. For example, mobile calls and SMS messages utilized separate protocols within cellular networks, just as email and text messaging employed different protocols over the Internet.

13. As described in the specification(s) of the patents-in-suit, individual users typically maintained different contact information (e.g., number or address) for different modes of communication. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 3, lines 63–66. This fragmented structure created significant challenges in managing communications. From the sender's perspective, initiating communication required knowledge of the recipient's specific contact information for the desired communication mode (e.g., landline number or email address). With different channels having different contact information, the sender was required to obtain, manage, and utilize multiple contact points to reach the recipient through various communication methods.

14. From the recipient's standpoint, the need to disclose separate contact information for each mode of communication diminished both privacy and confidentiality. For example, answering a call to a landline at a home or office inherently disclosed the recipient's location. Additionally, recipients lacked the ability to consistently enforce their communication preferences – such as determining who may contact them, when, and under what circumstances – across different communication modes. For instance, preventing a specific individual from communicating using one channel, such as a landline telephone, did not preclude that individual from communicating with the recipient through a different channel, such as email or text messaging.

15. Further, recipients faced the challenges of unwanted communications from spammers trying to send them annoying advertisements, and hackers trying to hack into their computing devices to perform all kinds of malicious acts.

16. Accordingly, prior to IngenioShare's invention(s), there existed an unmet need for a system and method to efficiently manage multiple communication modes while uniformly applying a user's privacy, accessibility, and confidentiality preferences across those modes.

**IngenioShare's Patented Technology Solves Prior Art Problems.**

17. IngenioShare's claimed inventions address technological problems associated with managing electronic communications, including unwanted communications across proliferating channels, through computer-implemented systems that manage communications using server-side functionality. These systems include the server-based communications architecture claimed in the '407 patent and the network-based portals claimed in the '810, '727, and '901 patents. Depending on the particular claims, these systems manage receipt and processing of electronic messages, provide multiple communication options, and protect users' contact information from disclosure. *See, e.g.,* U.S. Patent Nos. 8,744,407 at Claims 1 and 53; and 10,142,810 at Claim 1, Abstract, Column 1, lines 55–61, and Column 3, lines 43–58. As further detailed below, rather than reciting a practice from the pre-Internet world along with the requirement to perform it on the Internet, the claimed invention(s) are necessarily rooted in computer technology to overcome specific technological problems specifically arising in the realm of computer networks.

18. The systems and methods developed, disclosed, and claimed in IngenioShare's patents address numerous deficiencies and limitations inherent in the prior art. IngenioShare's patents teach an integrated solution that uniformly manages multiple communication modes in accordance with user-defined privacy, accessibility, and confidentiality preferences. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 3, lines 43–58.

19. One or more claimed embodiments of IngenioShare's invention(s) provide for a network-based portal enabling users to conduct communications across multiple modes. Every user is associated with an identifier or digital identity

which the network-based portal employs to manage all communication modes consistent with the user's specified preferences. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 4, lines 13-23 and Column 5, lines 33-36.

20. One or more claimed embodiments of IngenioShare's invention(s) leverages the convergence of multiple communication modalities onto Internet Protocol. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 4, lines 11–13. This convergence became possible in the late 1990's with the development of protocols such as the Session Initiation Protocol (SIP), as defined in RFC 2543 (March 1999), which facilitates the establishment and management of real-time communications—such as voice, video, and messaging—over the Internet. Nonetheless, full convergence occurred gradually over several years. For example, the original iPhone, released in 2007, utilized SMS for text messaging and traditional cellular networks for voice calls, thereby requiring an Internet connection only for email functionality; video calls were not yet supported. It was not until the introduction of iMessage in 2011 that the iPhone facilitated voice calls, email, text messaging, and video communications over Internet Protocol.

21. By contrast, under the prior art, although users may have possessed multiple devices capable of supporting various communication modes (e.g., desktop telephone, fax machine, cellular phone, desktop computer), with the exception of desktop computers, such devices were generally not connected to the Internet, and their communications did not and could not route through an Internet-based portal. While some cellular phones available prior to 2005 offered limited Internet access, it was primarily for email and web browsing; voice calls and text messaging continued to rely predominantly on the cellular network rather than Internet Protocol.

22. One or more claimed embodiments of IngenioShare's invention(s) enables a sender to initiate communication with a recipient across any communication channel based on Internet protocol, using the recipient's digital

identity, rather than requiring the sender to obtain and manage separate contact information for each mode. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 4, lines 15–23. The sender accesses a network-based portal and selects the desired mode of communication. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 2, lines 7–10. The network-based portal then identifies both the sender and the recipient and facilitates the communication via the selected mode – without disclosing the recipient's contact information to the sender, or vice versa. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 5, lines 42–48. This innovation streamlines the process of managing multiple contact points for a recipient. For example, a sender may continue to place a cellular call to a recipient using the recipient's digital identity, even if the recipient's mobile phone has changed.

23. One or more claimed embodiments of IngenioShare's invention(s) enhances privacy by enabling users to consistently enforce their communication preferences – such as specifying who may contact them, at what times, and under what circumstances – across all communication channels. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 4, lines 25–26. The user configures an access priority database within the network-based portal, which governs the handling of incoming communications based on the user's status, the sender's priority level, and the urgency of the message. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 4, lines 25–38 and lines 53–62, Column 6, lines 6–12, and Figs. 2–5. Unlike the prior art, IngenioShare's claimed network-based portal can apply the user's preferences uniformly to all incoming communications, regardless of the channel over which they are received.

24. Additionally, by users having digital identities separate from their contact information, one or more claimed embodiments of IngenioShare's invention(s) ensure a high level of confidentiality and privacy. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 2, lines 20–23. The portal facilitates the establishment and maintenance of communication using only the digital identities

of the sender and recipient, without disclosing their contact details, location, or other personal attributes. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 5, lines 22–52. In contrast to the prior art, IngenioShare's claimed and inventive approach allows users to identify the other communicating party without revealing contact or personal information.

25. As to challenges posted by spamming, in order for a spammer to reach a user, the spammer first registers with the network-based portal, exposing the spammer's identity. If the spammer is not in any of the user's contact classes, the portal would prevent the spammer's communication from reaching the user. If the spammer is in one of the contact classes, the user could easily ban the spammer from future communications by reclassifying the spammer accordingly.

26. As to hackers, one common approach they use is to pretend to be a friend of the user. Even if a hacker could somehow reach the user in a first call, the portal still prevents the hacker from getting at least the user's contact information and physical location. Thus, the network-based portal provides additional layer of defense against malicious attacks.

**<u>The Patents' Asserted Claims Are Directed to Patentable Subject Matter.</u>**

27. The asserted claims recite specific technological features that vary among the patents-in-suit. For example, the '407 patent claims a server-based system for receiving and processing electronic messages using rules based on, for example, user status and access priority, while preventing disclosure of the recipient's contact information. The '810, '727, and '901 patents claim network-based portals with communication-management features, including, depending on the particular claim, prior registration, user identifiers distinct from contact information, multiple communication modes, and the ability to block communications. See, e.g., U.S. Patent Nos. 8,744,407 at Claim 53 and 10,142,810 at Claim 1. These claimed combinations provide specific computer-implemented approaches to managing electronic communications and protecting user privacy.

IngenioShare's claimed invention(s) integrate these elements into an inventive solution that, as of the priority date, was neither routine nor conventional and could not be performed by a human. Moreover, when read as a whole, IngenioShare's claimed invention(s) delineate specific methods for implementing such solutions. Indeed, the focus of the claimed invention(s) is on specific improvements to computer capabilities. For example, the '810, '727, and '901 patents use a network-based portal that employs user identifiers, distinct from contact information, to manage multi-channel electronic communications while preserving user privacy and enforcing communication preferences. *See, e.g.*, U.S. Patent No. 10,142,810 at Claim 1.

28. In many embodiments, IngenioShare's claimed invention(s) disclose a network-based portal that facilitates user communications across multiple modes. The network-based portal serves as a neutral and independent intermediary, maintaining each user's privacy irrespective of whether the user initiates or receives a communication. *See* U.S. Patent No. 10,708,727 at Column 20, lines 41-52.

29. Certain claimed embodiments of IngenioShare's inventions employ a network-based portal architecture comprising at least enabling a user to provide contact information, user identifier, and communication preferences to the network-based portal before initiating or receiving any communication; and to set a specific communication process. The contact information is separate from and independent of the identifier. The network-based portal relies on this identifier to manage all modes of communication in accordance with the user's designated preferences, while preventing disclosure of the user's contact information to the other party. *See, e.g.*, U.S. Patent No. 10,142,810 at Column 4, lines 13-23, Column 5, lines 33-36, and Claim 1.

30. IngenioShare's claimed invention(s) set forth sufficient detail regarding how to implement the inventive concept in a specific and concrete

manner that was not known or practiced in the art as of the patents' priority date. Specifically, claim 1 of U.S. Patent No. 10,142,810 recites "a prior registration process by the first user regarding the use of the network-based portal," that "the method requires contact information associated with the second user to allow the second user to receive messages via the network-based portal," that "all of the communication options use one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal," that "the one identifier associated with the second user is distinct from the contact information associated with the second user," and that "the contact information associated with the second user is not provided via the network-based portal to the first user." *See* U.S. Patent No. 10,142,810 at Claim 1.

31. The specification(s) provide additional details regarding the information that the user provides to enable the user to communicate and how this information is stored in the network-based portal's database. "To illustrate, in one embodiment, a portal provides a number of intelligent communication modes (ICM) for the user to select as shown in FIG.1." *See* U.S. Patent No. 10,142,810 at Column 5, lines 60-62 and Figure 1. "As a receiver of communication, the user can define a number of contact classes, as shown in FIG.2. The user can set up a number of urgency classes, as shown in FIG. 3. The user can define a number of statuses, as shown in FIG. 4. Then, based on tables in FIGS. 1-4, the user can set up an Access Priority Database for different ContactClasses, as shown in FIG. 5." *See* U.S. Patent No. 10,142,810 at Column 6, lines 6-12 and Figures 2-5. The specification also explains how the network-based portal establishes communication between users while maintaining confidentiality. "After determining the identities, the system can establish connections between the caller and the user in real time. Though contacts are established, the system only needs to ensure the identities of the caller and the user to each other. However, the novel claimed system does not have to disclose the phone numbers, electronic addresses,

physical locations and/or other attributes of the caller and the user to each other." *See* U.S. Patent No. 10,142,810 at Column 5, lines 42-48.

32. Armed with the teachings of the claims and specification a person having ordinary skill in the art ("POSITA") would have been able to implement novel specific means to achieve the claimed result. The POSITA would implement a process whereby a user issues contact information and communication preferences to the network-based portal; for example, the contact information would be email address or phone number, and the communication preferences would be similar to those in Figures 2-4. *See* U.S. Patent No. 10,142,810 at Figs. 2-4. The contact information is distinct from an identifier set enabling the user to communicate. The POSITA would also implement a database to store the information tables shown in Figures 1-4. *See* U.S. Patent No. 10,142,810 at Figs. 1-4. This database could include the Access Priority Database shown in Figure 5 that displays relationships among the information in the various tables. This database would allow the network-based portal to determine the appropriate communication mode(s) (from Figure 1) based on the caller's contact class (from Figure 2), the urgency of the message (from Figure 3), and the state of the callee (from Figure 4). *See* U.S. Patent No. 10,142,810 at Figures 1-5.

33. Another implementation of a specific and novel communication process includes when a first user contacts the network-based portal, employs the identifier associated with a second user, and selects from available communication options. The network-based portal then uses that identifier and initiates the communication such that the second user receives the message through the selected option, but without revealing the second user's contact information to the first user, or vice versa. Through these specific registration and communication processes, the POSITA would achieve the claimed result that "even when the first message is received by the second user […] contact information associated with the second user […] is not provided via the network-based portal to the first user, and contact

information associated with the first user […] is not provided via the network-based portal to the second user." *See* U.S. Patent No. 10,708,727 at Claim 1.

34. Similarly, claim 1 of IngenioShare's '810 patent provides ample detail to demonstrate how the invention achieves another important novel and nonconventional result, namely, "permitting the second user to block the first user," such that a POSITA would readily understand how to implement this feature. In particular, IngenioShare's claimed inventive approach teaches that "a piece of information regarding the second user blocking the first user from reaching the second user is stored in a storage medium" with this "piece of information being based on at least an input previously submitted by the second user." *See, e.g.*, U.S. Patent No. 10,142,810 at Claim 1. Accordingly, a POSITA would readily be able to implement a novel and nonconventional method whereby the second user notifies the network-based portal of an intention to block the first user, with the network-based portal recording this information in a storage medium. The POSITA would further adapt the communication process such that, when the first user attempts to initiate contact with the second user via a communication mode, the network-based portal first consults the storage medium for any blocking instructions. If none are present, the communication process proceeds as previously described; if blocking information is found, the network-based portal prevents the first user from reaching the second user via the communication mode. *See, e.g.*, U.S. Patent No. 10,142,810 at Claim 1.

**<u>The Patents' Asserted Claims Articulate an Inventive Concept that Cannot Be Carried Out Through Any Human-Performable Process.</u>**

35. IngenioShare's claimed inventions recite different combinations of computer-implemented features that, considered as a whole, provide technological solutions to managing electronic communications and protecting user privacy. For example, certain claims require a network-based portal that manages communications using user identifiers and communication preferences, while other

claims require a server that receives and processes messages according to user status and access priority. By way of example, one might consider the role of a receptionist in an office building who facilitates communication between visitors and employees, or that of an executive assistant who screens phone calls or emails directed to an executive. Both the receptionist and an executive assistant act as a human intermediary who manages the communications directed to the employees or executive, respectively. However, equating a receptionist or executive assistant with a network-based portal is, at best, a superficial analogy. It fails to account for the specific claim elements as implemented in IngenioShare's claimed invention and does not replicate, or otherwise achieve, the results accomplished by the claimed invention.

36. First, the network-based portal is an entity entirely separate from both sender and receiver, whereas the receptionist is inherently tied to the employee, or at a minimum, to the employee's workplace. Thus, while a sender may engage with the network-based portal without possessing any contact information of the receiver, a visitor must, as an example, already know the employee's contact location in order to reach the receptionist and initiate communication. Likewise, one must know the executive's phone number or email address to reach the executive assistant.

37. Second, where communication with the employee must be routed through a receptionist, executive assistant, or similar intermediary, that intermediary constitutes part of the employee's contact information. Accordingly, the process of contacting the employee through such an intermediary necessarily results in disclosure of that information to the sender – unlike the network-based portal of the invention that does not disclose to the sender any contact information of the receiver.

38. Third, multiple asserted claims describe the network-based portal operating as a neutral entity, not under the control of either the first user (visitor) or

the second user (employee), thereby enabling communication between the parties while preserving the confidentiality of their contact information. For example, claim 1 of the ’727 patent recites that “contact information associated with the first user and provided by the first user to the network-based portal is not provided via the network-based portal to the second user, so as to […] provide an option to the first user to keep the contact information associated with the first user confidential from the second user.” *See* U.S. Patent No. 10,708,727 at Claim 1. By contrast, as discussed above, a receptionist or executive assistant is inherently aligned with the employee and, by virtue of that relationship, does not maintain the visitor’s contact information as confidential. To the contrary, one of the central functions of a receptionist or executive assistant is to record the visitor’s contact information and relay it to the employee, thereby facilitating the employee’s initiation of communication with the visitor.

39. Fourth, while a receptionist may require visitors to sign in, that process is not equivalent to IngenioShare’s claimed prior registration process. Under IngenioShare’s novel and unconventional claimed invention, in many embodiments, a sender cannot initiate communication with a receiver through the network-based portal until the sender has completed the registration process. By contrast, in the receptionist scenario, the visitor already knows the employee’s work location and initiates communication with the receptionist (and, hence, the employee) by virtue of having that location information before any registration occurs. Likewise, in the executive assistant scenario, a person must already have the executive’s contact information (phone number or email address) to initiate communication before the executive assistant intervenes.

40. Fifth, certain claims require both the sender and receiver of communications to have their own identifiers: “wherein the identifier associated with the second user is distinct from the contact information associated with the second user, and the identifier associated with the first user is distinct from the

contact information associated with the first user." *See* U.S. Patent No. 10,708,727 at Claim 1. A human intermediary, on the other hand, does not distinguish separate identifiers and contact information for users. When visitors sign in with the receptionist, they may present an ID card or other information for identification. As part of the sign-in process, the receptionist may request contact information, but no separate identifier is established. Likewise, employees are not required to sign in and are not associated with separate identifiers through the receptionist. For example, if the employee the visitor seeks is unavailable, the receptionist may either take a message for the employee or provide the employee's phone number or other contact information to the visitor – but will not use a separate identifier to initiate communication between the visitor and the employee. Likewise, when the employee returns, the receptionist will relay the message or contact information supplied by the visitor without relying on any identifier for doing so.

41. Sixth, many claims teach that "the plurality of communication options [are] provided to the first user to send messages to the electronic device associated with the second user" and that the method "enabl[es], via the network-based portal, the message to be received by the second user … using the selected option of communication." *See* U.S. Patent No. 10,142,810 at Claim 1. In other words, the claim requires the first user to select a communication option and transmit a message using that option, with the network-based portal serving to facilitate delivery of the message to the second user. A human intermediary, on the other hand, cannot accomplish this result. As a way of example, while a receptionist may offer to take a message or connect the visitor to the employee's voicemail, such communication is initiated and controlled entirely by the receptionist, not the visitor.

42. For all the foregoing reasons, the claimed computer-implemented communication-management systems cannot be reduced to the conventional activities of a receptionist or executive assistant. The asserted patents recite

different technological implementations, including server-based message processing and network-based-portal communication management, that perform functions beyond those of the proposed human intermediaries. IngenioShare's asserted claims recite novel and unconventional methods that were neither performed by humans nor capable of being performed by humans as of the priority date. As of the patents' priority date, no analogous human-executed processes existed that the invention merely automated or placed "on a computer." Specifically, no process existed in which users were required to provide contact information and identifier with a human intermediary before initiating direct communication between their electronic devices through that intermediary. Likewise, there were no processes in which a human intermediary, based on users' identifiers, established direct communication between the users' electronic devices across multiple channels. Similarly, there were no processes in which a human intermediary presented communication options (e.g., text or voice) to a user, the user selected an option and transmitted a message through the user's electronic devices using that option, and the intermediary then forwarded the message to a corresponding recipient's electronic device.

**<u>IngenioShare's U.S. Patent No. 8,744,407</u>**

43. On June 3, 2014, the United States Patent and Trademark Office duly and legally issued United States Patent No. 8,744,407 ("the '407 patent"), entitled "Systems And Processes To Manage Multiple Modes Of Communication." A true and correct copy of the '407 patent is attached hereto as Exhibit A.

44. IngenioShare is the owner, by assignment, of all right, title, and interest in and to the '407 patent, including the right to bring suit for past, present, and future patent infringement, and to collect past, present, and future damages.

45. The claims of the '407 patent are focused on the above-described advances over the prior art and the advances over the prior art also described in the '407 patent, such that their character as a whole is not directed to excluded subject

matter, including an abstract idea, and any other subject matter excluded under 35 U.S.C. § 101.

46. Claim terms, including but not limited to the following claim terms, define the claimed invention(s) in a non-abstract manner that satisfies 35 U.S.C. § 101. These representative claim terms also were not previously performed, and could not be performed, by a human. These representative claim terms also align with how IngenioShare's invention(s) solves the prior art problems discussed above and also in the '407 patent.

- "a server based on a communication protocol";
- "managing the communications of a user" "using a first device" "to electronically convey a message" to "a handheld device";
- "at least one computing device" "configured" to "receive a message", "identify the person attempting to electronically convey the message", and "set a process for the message using one or more rules based on at least a status associated with the user and an access priority associated with the person, the status depending at least in part on the current activity or location of the user, or the current time, and access priority depending on the person";
- "wherein the server is configured to have access to contact information of the person";
- "wherein even if the process includes transmitting the message to the second device via contact information of the user, the server does not provide the contact information of the user to the first device to inhibit the person from sending messages to the user without via the server";
- "wherein the server is configured to be aware of availability of the user"; and
- "wherein the server is configured to send information to the person regarding availability of the user".

47. The above-listed representative claim terms, standing alone and in combination with one another, also define inventive concept(s) that were not well-understood, routine, or conventional as of the priority date of the ’407 patent.

48. The Patent Office determined all the claims of the ’407 patent to be patent eligible, definite, novel and nonobvious.

49. The ’407 patent solves real-world, technological problems.

50. The solutions disclosed and claimed in the ’407 patent are utilized in computing apparatuses, including as detailed in the claim charts attached as Exhibit B and C.

51. The claims of the ’407 patent recite features that address the technical problems and challenges in the art, thereby providing specific technological solutions that improved the state of the art.

52. The inventions claimed in the ’407 patent were not well-understood, routine, or conventional as of the priority date of the ’407 patent, but instead claim specific, novel, and nonobvious improvements to the prior art.

53. The ’407 patent is compliant with 35 U.S.C. § 101.

54. The ’407 patent is compliant with 35 U.S.C. § 102.

55. The ’407 patent is compliant with 35 U.S.C. § 103.

56. The ’407 patent is compliant with 35 U.S.C. § 112.

57. The ’407 patent is presumed valid and enforceable in accordance with 35 U.S.C. § 282.

## **IngenioShare’s U.S. Patent No. 10,142,810**

58. On November 27, 2018, the United States Patent and Trademark Office duly and legally issued United States Patent No. 10,142,810 (“the ’810 patent”), entitled “Method and Apparatus to Manage Different Options of Communications Using One User Identifier Based on Internet Protocol.” A true and correct copy of the ’810 patent is attached hereto as Exhibit D.

59. IngenioShare is the owner, by assignment, of all right, title, and

interest in and to the ’810 patent, including the right to bring suit for past, present, and future patent infringement, and to collect past, present, and future damages.

60. The claims of the ’810 patent are focused on the above-described advances over the prior art and the advances over the prior art also described in the ’810 patent, such that their character as a whole is not directed to excluded subject matter, including an abstract idea, and any other subject matter excluded under 35 U.S.C. § 101.

61. Claim terms, including but not limited to the following claim terms, define the claimed invention(s) in a non-abstract manner that satisfies 35 U.S.C. § 101. These representative claim terms also were not previously performed, and could not be performed, by a human. These representative claim terms also align with how IngenioShare’s invention(s) solves the prior art problems discussed above and also in the ’810 patent.

- “managing electronic communications using at least a network-based portal”;
- “a plurality of communication options”;
- “a prior registration process”;
- “all of the communication options use one identifier associated with the second user”;
- “permitting the second user to block the first user from reaching the second user via the network-based portal”;
- “enabling, via the network-based portal, the message to be received by the second user through the electronic device associated with the second user, using the selected option of communication, based on the one identifier associated with the second user, in view of the second user not blocking the first user from reaching the second user”;
- “determining availability of the second user”;
- “wherein even when the message is received by the second user

through the electronic device associated with the second user based on the one identifier associated with the second user, the contact information associated with the second user is not provided via the network-based portal to the first user through the electronic device associated with the first user";

- and "the one identifier associated with the second user is distinct from the contact information".

62. The above-listed representative claim terms, standing alone and in combination with one another, also define inventive concept(s) that were not well-understood, routine, or conventional as of the priority date of the '810 patent.

63. The Patent Office determined all the claims of the '810 patent to be patent eligible, definite, novel and nonobvious.

64. The '810 patent solves real-world, technological problems.

65. The solutions disclosed and claimed in the '810 patent are utilized in computing apparatuses, including as detailed in the claim charts attached as Exhibits E and F.

66. The claims of the '810 patent recite features that address the technical problems and challenges in the art, thereby providing specific technological solutions that improved the state of the art.

67. The inventions claimed in the '810 patent were not well-understood, routine, or conventional as of the priority date of the '810 patent, but instead claim specific, novel, and nonobvious improvements to the prior art.

68. The '810 patent is compliant with 35 U.S.C. § 101.

69. The '810 patent is compliant with 35 U.S.C. § 102.

70. The '810 patent is compliant with 35 U.S.C. § 103.

71. The '810 patent is compliant with 35 U.S.C. § 112.

72. The '810 patent is presumed valid and enforceable in accordance with 35 U.S.C. § 282, subject to the procedural history described below.

**<u>IngenioShare's U.S. Patent No. 10,708,727</u>**

73. On July 7, 2020, the United States Patent and Trademark Office duly and legally issued United States Patent No. 10,708,727 ("the '727 patent"), entitled "Method and Apparatus to Manage Messaging Providing Different Communication Modes Using One Identifier and Not Requiring to Disclose Contact Information." A true and correct copy of the '727 patent is attached hereto as Exhibit G.

74. IngenioShare is the owner, by assignment, of all right, title, and interest in and to the '727 patent, including the right to bring suit for past, present, and future patent infringement, and to collect past, present, and future damages.

75. The claims of the '727 patent are focused on advances over the prior art such that their character as a whole is not directed to excluded subject matter, such as an abstract idea, or any other subject matter excluded under 35 U.S.C. §101.

76. Claim terms, including but not limited to the following claim terms, define the claimed invention(s) in a non-abstract manner that satisfies 35 U.S.C. § 101. These representative claim terms also were not previously performed, and could not be performed, by a human. These representative claim terms also align with how IngenioShare's invention(s) solves the prior art problems discussed above and also in the '727 patent.

- "providing a plurality of modes of communication to a first user to allow the first user to use one of the plurality of modes of communication as a selected mode of communication for a first message to be sent from the first user to a second user, based on an identifier associated with the first user previously set by the first user via the network-based portal",
- "wherein the plurality of modes of communication supported by the network-based portal include at least text communication using a

personal computer, voice communication using a personal computer, and communication with at least an image", and

- "wherein messages are eligible to be received by the second user via the network-based portal, based on any of the plurality of modes of communication, all depending on an identifier associated with the second user previously set by the second user via the network-based portal, which allows the second user to efficiently maintain the second user's communication using the plurality of modes of communication";
- "enabling the second user to block the first user from using at least the selected mode of communication to communicate with the second user via the network-based portal, based on the identifier associated with the first user";
- "enabling the first message to be provided to the second user, using the selected mode of communication, depending on the identifier associated with the second user, in view of the second user not blocking the first user from using the selected mode of communication to communicate with the second user, via the network-based portal"; and
- "receiving a second message from the second user to the first user, to respond to the first message, after the second user has received the first message",
- "wherein one of the first message or the second message is voice and the other of the first message or the second message is text",
- "wherein even when the first message is received by the second user via the selected mode of communication, contact information associated with the second user and provided by the second user to the network-based portal is not provided via the network-based portal to

the first user, and contact information associated with the first user and provided by the first user to the network-based portal is not provided via the network-based portal to the second user, so as to provide an option to the second user to keep the contact information associated with the second user confidential from the first user, and to provide an option to the first user to keep the contact information associated with the first user confidential from the second user",

- "wherein the identifier associated with the second user is distinct from the contact information associated with the second user, and the identifier associated with the first user is distinct from the contact information associated with the first user",
- "wherein the contact information associated with the second user includes at least one of a phone number or an email address of the second user", and
- "wherein the contact information associated with the first user includes at least one of a phone number or an email address of the first user."

77. The above-listed representative claim terms, standing alone and in combination with one another, also define inventive concept(s) that were not well-understood, routine, or conventional as of the priority date of the '727 patent.

78. The Patent Office determined all the claims of the '727 patent to be patent eligible, definite, novel and nonobvious.

79. The inventions claimed in the '727 patent solve real-world, technological problems.

80. The solutions disclosed and claimed in the '727 patent are utilized in computing apparatuses, including those detailed in the claim charts attached as Exhibits H and I.

81. The claims of the '727 patent recite features that address the technical

problems and challenges in the art, thereby providing specific technological solutions that improved the state of the art. Thus, the claims are not directed to an abstract concept.

82. The inventions claimed in the ’727 patent were not well-understood, routine, or conventional as of the priority date of the ’727 patent, but instead claim specific, novel, and nonobvious improvements to the prior art.

83. The ’727 patent is compliant with 35 U.S.C. § 101.

84. The ’727 patent is compliant with 35 U.S.C. § 102.

85. The ’727 patent is compliant with 35 U.S.C. § 103.

86. The ’727 patent is compliant with 35 U.S.C. § 112.

87. The ’727 patent is presumed valid and enforceable in accordance with 35 U.S.C. § 282, subject to the procedural history described below.

**IngenioShare’s U.S. Patent No. 12,143,901**

88. On November 12, 2024, the United States Patent and Trademark Office duly and legally issued United States Patent No. 12,143,901 (“the ’901 patent”), entitled “Method and Apparatus to Manage Communication.” A true and correct copy of the ’901 patent is attached hereto as Exhibit J.

89. IngenioShare is the owner, by assignment, of all right, title, and interest in and to the ’901 patent, including the right to bring suit for past, present, and future patent infringement, and to collect past, present, and future damages.

90. The claims of the ’901 patent are focused on advances over the prior art such that their character as a whole is not directed to excluded subject matter, such as an abstract idea, or any other subject matter excluded under 35 U.S.C. §101.

91. Claim terms, including but not limited to the following claim terms, define the claimed invention(s) in a non-abstract manner that satisfies 35 U.S.C. § 101. These representative claim terms also were not previously performed, and could not be performed, by a human. These representative claim terms also align

with how IngenioShare's invention(s) solves the prior art problems discussed above and also in the '901 patent.

- "providing a plurality of modes of communication to electronic devices of the plurality of users via the network-based portal to allow the plurality of users to communicate in at least a session in real time, with the plurality of modes of communication including at least communication with voice, communication with text, and communication with at least an image",
- "with the plurality of users including a first user being provided the plurality of modes of communication to an electronic device of the first user to allow the first user to use at least one of the plurality of modes of communication as a selected mode of communication for sending a first message from the electronic device of the first user to at least an electronic device of a second user, in the at least the session, based on at least an identifier associated with the first user previously set by the first user via the network-based portal on the one or more network servers",
- "with messages eligible to be received by at least the electronic device of the second user via the network- based portal, using any of the plurality of modes of communication, based on at least an identifier associated with the second user previously set by the second user via the network-based portal to identify the second user in the network-based portal",
- "computer program code for preventing the electronic device of the second user to receive the first message from the electronic device of the first user via the network-based portal, at least based on the identifier associated with the first user, and at least based on an input from the second user",

- "computer program code for receiving a second message from the second user via the electronic device of the second user for sending to at least the electronic device of the first user, in the at least the session",
- "wherein contact information associated with the second user and provided by the second user to the network- based portal is not provided via the network-based portal to the electronic device of the first user, and contact information associated with the first user and provided by the first user to the network-based portal is not provided via the network-based portal to the electronic device of the second user",
- "wherein the contact information associated with the second user allows the second user to be contacted via the contact information without using the network-based portal",
- "wherein the contact information associated with the first user allows the first user to be contacted via the contact information without using the network-based portal",
- "wherein the identifier associated with the second user is distinct from the contact information associated with the second user",
- "wherein the identifier associated with the first user is distinct from the contact information associated with the first user",
- "wherein the contact information associated with the second user includes at least one of a phone number or an email address of the second user",
- "wherein the contact information associated with the first user includes at least one of a phone number or an email address of the first user."

92. The above-listed representative claim terms, standing alone and in

combination with one another, also define inventive concept(s) that were not well-understood, routine, or conventional as of the priority date of the ’901 patent.

93. The Patent Office determined all the claims of the ’901 patent to be patent eligible, definite, novel and nonobvious.

94. The inventions claimed in the ’901 patent solve real-world, technological problems.

95. The solutions disclosed and claimed in the ’901 patent are utilized in computing apparatuses, including those detailed in the claim charts attached as Exhibits K and L.

96. The claims of the ’901 patent recite features that address the technical problems and challenges in the art, thereby providing specific technological solutions that improved the state of the art. Thus, the claims are not directed to an abstract concept.

97. The inventions claimed in the ’901 patent were not well-understood, routine, or conventional as of the priority date of the ’901 patent, but instead claim specific, novel, and nonobvious improvements to the prior art.

98. The ’901 patent is compliant with 35 U.S.C. § 101.

99. The ’901 patent is compliant with 35 U.S.C. § 102.

100. The ’901 patent is compliant with 35 U.S.C. § 103.

101. The ’901 patent is compliant with 35 U.S.C. § 112.

102. The ’901 patent is presumed valid and enforceable in accordance with 35 U.S.C. § 282.

103. IngenioShare’s ’407, ’810, ’727, and ’901 patents are collectively referred to herein as the “patents-in-suit.”

## THE EASTERN DISTRICT OF NORTH CAROLINA ERRONEOUSLY FOUND SOME OF THE CLAIMS ASSERTED HEREIN INVALID

104. On July 2, 2025, IngenioShare filed suit against Epic Games, Inc. in the Eastern District of North Carolina, asserting the ’810 and ’727 patents, which

are also asserted in this action. IngenioShare's '407 and '901 patents were not asserted or adjudicated in the Eastern District of North Carolina action.

105. On June 4, 2026, the Eastern District of North Carolina entered an order finding invalid claims 1 and 11 of IngenioShare's '810 patent, and claims 1-3, 6-9, and 15-17 of IngenioShare's '727 patent under 35 U.S.C. § 101. *See* Exhibit M, Order.

106. On June 16, 2026, IngenioShare timely filed a notice of appeal with the Court of Appeals for the Federal Circuit, Case Number 26-1944. IngenioShare filed its opening appeal brief on August 31, 2026. *See* Exhibit N, Appellant's Opening Brief.

107. IngenioShare intends to promptly move to stay this action pending the Federal Circuit's resolution of that appeal.

## THE PATENT OFFICE'S INTER PARTES REVIEWS ("IPRs") OF THREE OF THE PATENTS-IN-SUIT

108. On December 8, 2021, Epic Games, Inc. ("Epic") filed a Petition for Inter Partes Review of the '407 patent.

109. On May 26, 2022, the Patent Office denied institution of IPR of the '407 patent, IPR2022-00297. *See* Exhibit O, Decision Denying Institution of *Inter Partes* Review.

110. In the Decision denying institution of IPR for the '407 patent the Patent Office found that "the Petition and evidence in this record do not establish that there is a reasonable likelihood that Petitioner would prevail in challenging claims 1, 2, 5, 7, 53, 54, 56, 57, and 59 of the '407 patent." *See* Exhibit O, Decision Denying Institution of *Inter Partes* Review.

111. On November 15, 2021, Epic filed a Petition for Inter Partes Review of the '810 patent.

112. On May 23, 2022, the Patent Office instituted an IPR of the '810 patent, IPR2022-00202.

113. On May 19, 2023, the Patent Office entered a Final Written Decision in IPR2022-00202 finding the claims of the ’810 patent are not unpatentable. *See* Exhibit P.

114. On December 7, 2021, Epic filed two Petitions For Inter Partes Review of the U.S. Patent No. 10,492,038.

115. On December 7, 2021, Epic filed a Petition for Inter Partes Review of the ’727 patent.

116. On May 24, 2022, the Patent Office instituted an IPR of the ’727 patent, IPR2022-00291.

117. On May 19, 2023, the Patent Office entered a Final Written Decision in IPR2022-00291 finding the claims of the ’727 patent are not unpatentable. *See* Exhibit Q.

118. In its Final Written Decisions related to the ’810 patent and ’727 patent, the Patent Office found that the claimed “network-based portal”—which appears in the corresponding independent claims—was both “central to the parties’ respective positions” and not found in the prior art. *See, e.g.*, Exhibit P at 14 (“The phrase ‘network-based portal’ is recited numerous times in each of the independent claims of the ’810 patent, and its construction is central to the parties’ respective positions regarding application of Petitioner’s asserted prior art to the challenged claims.”), 36–37 (“Because Petitioner does not show that Diacakis discloses a ‘network-based portal’ as so construed, we conclude that Petitioner does not show, by a preponderance of the evidence, that independent claim 1 is unpatentable under 35 U.S.C. § 103(a) over Diacakis. The same deficiency exists with respect to Petitioner’s analysis of independent claims 11 and 19. Because the deficiency in Petitioner’s showing also applies to the dependent claims, which inherit the ‘network-based portal’ limitations, we conclude that Petitioner does not show that any of claims 1–20 is unpatentable under 35 U.S.C. § 103(a) over Diacakis.”), 38 (“Under our adopted construction, Petitioner does not show that the combination of

Tanigawa and Hullfish meets the claim requirements of a 'network-based portal.'"); Exhibit Q at 14, 35–36, and 40 (same findings).

119. Based on the above record, the claimed "network-based portal"—on its own and in combination with other claimed elements, including at least the claimed "prior registration process," user "identifier" distinct from "contact information," and specific communication process without requiring the disclosure of contact information—is neither routine nor conventional. *See generally* Exhibits P-Q.

120. Moreover, in its Decision Denying Institution related to the '407 patent, the Patent Office found that the prior art relied upon by the petitioner failed to disclose or suggest key limitations of the claimed invention. Exhibit O at 14–20, 23–26. Specifically, the Patent Office found that the asserted prior art failed to disclose the claimed server receiving the message that a sender seeks to convey to a recipient's electronic device. *Id.* The Patent Office thus recognized a material distinction between the prior art and the '407 patent's claimed server-based communication architecture, in which the server itself receives the message intended for the recipient's device. *Id.* at 26–27. This distinction is consistent with the server-side communication architecture disclosed in IngenioShare's related patents, including the network-based portal claimed in the '810 and '727 patents, which facilitates communications between users rather than providing contact information to enable users to communicate independently. Unlike prior-art systems that provided a recipient's contact information to facilitate communications occurring independently of the server, the '407 patent claims a server-based architecture in which the server itself receives and processes the message intended for the recipient's electronic device.

**THE COURT OF APPEALS FOR THE FEDERAL CIRCUIT AFFIRMED THE PATENT OFFICE'S FINAL WRITTEN DECISIONS.**

121. On April 24, 2025, the Court of Appeals for the Federal Circuit

affirmed the Patent Office's Final Written Decisions in IPR2022-00202 regarding the '810 patent and IPR2022-00291 regarding the '727 patent. *See Epic Games, Inc. v. Ingenioshare, LLC*, Case Nos. 2023-2177, 2023-2178, 2023-2179, 2023-2180, 2025 U.S. App. LEXIS 9753 (Fed. Cir. April 24, 2025). In its decision, the Federal Circuit affirmed the Board's construction of "network-based portal" as residing on the server side of the network and affirmed the determination that Epic had not shown the challenged claims unpatentable as obvious.

## **RIOT'S INFRINGING SYSTEMS AND METHODS**

122. Riot is a video game developer and publisher based in Los Angeles, California. Riot is among the world's leading video game companies and the owner of the game titled "League of Legends" and its several spin-off titles (collectively, "League"). League titles include "Teamfight Tactics" (available in both the League PC game client or as a standalone mobile app) and "League of Legends: Wild Rift," (a standalone mobile app).

123. Riot also is the owner of the game titled "Valorant," which is a team-based tactical shooter game that generally includes teams of five players. In standard gameplay, players initially receive a free pistol and at least one charge of their character's signature ability. Additional weapons and ability charges can be purchased using an in-game economy system, and certain equipment may carry over between rounds. The game offers a variety of playable characters, known as agents, that can be unlocked using Valorant Points, through Agent Recruitment Events, or, following the applicable recruitment period, using Kingdom Credits. Players with an eligible linked Xbox Game Pass subscription also have access to all agents while their subscription remains active.

124. League and Valorant are designed to enable players to communicate with one another.

125. In order to download, play, or otherwise access Defendant's League and Valorant games, a user must agree to the End User License Agreement.

126. Defendant's players must agree to the End User License Agreement before downloading, playing, or otherwise accessing League and Valorant.

127. By agreeing to Defendant's League and Valorant End User License Agreement, that user enters into a valid and enforceable contract with Defendant.

128. On information and belief, in addition to League and Valorant, Riot Games also provides additional and similar video games on similar terms.

**COUNT ONE: DIRECT INFRINGEMENT OF INGENIOSHARE'S '407 PATENT**

129. IngenioShare realleges and incorporates herein the preceding allegations of this Complaint as if fully set forth herein.

130. Riot has infringed one or more claims of the '407 patent, including at least claim 53, in violation of 35 U.S.C. § 271(a) by making, using, offering to sell, or selling the patented invention within the United States or importing the patented invention into the United States.

131. A representative example of Riot's infringing apparatuses, methods, and systems includes (but is not limited to) Riot's video games known as League of Legends and Valorant. A representative claim chart demonstrating League of Legends' infringement of the '407 patent, either literally or under the doctrine of equivalents, is attached as Exhibit B. A representative claim chart demonstrating Valorant's infringement of the '407 patent, either literally or under the doctrine of equivalents, is attached as Exhibit C. Riot's infringing apparatuses, methods, and systems include, without limitation, other video games providing functionality such as that shown in the representative charts ("Riot's Accused Products").

132. Riot was contacted regarding the '407 patent at least as early as October 11, 2019.

133. Riot has had actual notice of its infringement of the '407 patent since at least the filing of this Complaint.

134. IngenioShare has suffered damages as a direct and proximate result of

Riot's direct infringement of the '407 patent.

**COUNT TWO: DIRECT INFRINGEMENT OF INGENIOSHARE'S '810 PATENT**

135. IngenioShare realleges and incorporates herein the preceding allegations of this Complaint as if fully set forth herein.

136. Riot has infringed one or more claims of the '810 patent, including at least claim 1, in violation of 35 U.S.C. § 271(a) by making, using, offering to sell, or selling the patented invention within the United States or importing the patented invention into the United States, and/or using and performing the claimed method in the United States through operation of the accused League of Legends and Valorant communication functionality.

137. A representative example of Riot's infringing apparatuses, methods, and systems includes (but is not limited to) Riot's video games known as League of Legends and Valorant. A representative claim chart demonstrating League of Legends' infringement of the '810 patent, either literally or under the doctrine of equivalents, is attached as Exhibit E. A representative claim chart demonstrating Valorant's infringement of the '810 patent, either literally or under the doctrine of equivalents, is attached as Exhibit F. Riot's Accused Products include infringing apparatuses, methods, and systems include, without limitation, other video games providing functionality such as that shown in the representative charts.

138. Riot was contacted regarding the '810 patent at least as early as November 29, 2018.

139. Riot has had actual notice of its infringement of the '810 patent since at least the filing of this Complaint.

140. IngenioShare has suffered damages as a direct and proximate result of Riot's direct infringement of the '810 patent.

**COUNT THREE: DIRECT INFRINGEMENT OF INGENIOSHARE'S '727 PATENT**

141. IngenioShare realleges and incorporates herein the preceding allegations of this Complaint as if fully set forth herein.

142. Riot infringed one or more claims of the ’727 patent, including at least claim 1, in violation of 35 U.S.C. § 271(a) by making, using, offering to sell, or selling the patented invention within the United States or importing the patented invention into the United States, and/or using and performing the claimed method in the United States through operation of the accused League of Legends and Valorant communication functionality.

143. A representative example of Riot’s infringing apparatuses, methods, and systems includes (but is not limited to) Riot’s video games known as League of Legends and Valorant. A representative claim chart demonstrating League of Legends’ infringement of the ’727 patent, either literally or under the doctrine of equivalents, is attached as Exhibit H. A representative claim chart demonstrating Valorant’s infringement of the ’727 patent, either literally or under the doctrine of equivalents, is attached as Exhibit I. Riot’s Accused Products include infringing apparatuses, methods, and systems include, without limitation, other video games providing functionality such as that shown in the representative charts.

144. Riot has had actual notice of its infringement of the ’727 patent since at least the filing of this Complaint.

145. IngenioShare has suffered damages as a direct and proximate result of Riot’s direct infringement of the ’727 patent.

## COUNT FOUR: DIRECT INFRINGEMENT OF INGENIOSHARE’S ’901 PATENT

146. IngenioShare realleges and incorporates herein the preceding allegations of this Complaint as if fully set forth herein.

147. Riot infringed one or more claims of the ’901 patent, including at least claim 1, in violation of 35 U.S.C. § 271(a) by making, using, offering to sell, or selling the patented invention within the United States or importing the patented

invention into the United States.

148. A representative example of Riot's infringing apparatuses, methods, and systems includes (but is not limited to) Riot's video games known as League of Legends and Valorant. A representative claim chart demonstrating League of Legends' infringement of the '901 patent, either literally or under the doctrine of equivalents, is attached as Exhibit K. A representative claim chart demonstrating Valorant's infringement of the '901 patent, either literally or under the doctrine of equivalents, is attached as Exhibit L. Riot's Accused Products include infringing apparatuses, methods, and systems include, without limitation, other video games providing functionality such as that shown in the representative charts.

149. Riot has had actual notice of its infringement of the '901 patent since at least the filing of this Complaint.

150. IngenioShare has suffered damages as a direct and proximate result of Riot's direct infringement of the '901 patent.

## PRAYER FOR RELIEF

WHEREFORE, IngenioShare seeks the following relief:

a. Declaring that Riot has infringed IngenioShare's '407 patent, IngenioShare's '810 patent, IngenioShare's '727 patent, and IngenioShare's '901 patent;

b. Awarding IngenioShare damages adequate to compensate IngenioShare for Riot's infringement of IngenioShare's '407 patent, IngenioShare's '810 patent, IngenioShare's '727 patent, and IngenioShare's '901 patent pursuant to 35 U.S.C. § 284;

c. Awarding IngenioShare prejudgment interest pursuant to 35 U.S.C. § 284;

d. Awarding IngenioShare post-judgment interest pursuant to 28 U.S.C. § 1961;

e. Declaring this case exceptional and awarding IngenioShare its

reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

f. Awarding IngenioShare its costs as permitted by law; and

g. Awarding IngenioShare such other and additional relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), IngenioShare demands a trial by jury of all issues so triable.

Respectfully submitted,

Dated: October 21, 2026 ROBINS KAPLAN LLP

By: */s/ Li Zhu*
Cyrus A. Morton (*pro hac vice* forthcoming)
Li Zhu

Stephen R. Risley (*pro hac vice* forthcoming)
KENT & RISLEY LLC
5755 North Point Parkway, Suite 57
Alpharetta, Georgia 30022
Telephone: 404-855-2101
Email: steverisley@kentrisley.com

Attorneys for Plaintiff,
IngenioShare, LLC